```
          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF ALABAMA
               NORTHEASTERN DIVISION
```
                                                    FILED
                                              98 JAN 16 PM 2:52
                                              U.S. DISTRICT COURT
ROGER DYAR,                      )            N.D. OF ALABAMA
                                 )
     Plaintiff,                  )
                                 )
vs.                              )   Civil Action No. CV96-S-1883-NE
                                 )
GENERAL MOTORS CORPORATION, etc. )
                                 )            ENTERED
     Defendant.                  )
                                              JAN 1 6 1998

## MEMORANDUM OPINION

Roger Dyar alleges General Motors Corporation ("G.M.") discriminated against him in violation of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12101 et seq. He claims that G.M. denied reasonable accommodations and terminated his employment because he suffers from asbestosis. The action presently is before the court on G.M.'s motion for summary judgment. Upon consideration of the pleadings, briefs, and evidentiary submissions, this court concludes the motion is due to be granted.

### I. FACTS

#### A. Plaintiff's Employment and Asbestosis Diagnosis

Roger Dyar began his employment with G.M. on October 8, 1994. He worked as a "millwright" in defendant's Delphi Saginaw Steering Systems plant located in Athens, Alabama. (Plaintiff's deposition at 10-11.) He transferred to a maintenance supervisor's position in the plant's fabrication shop in 1992, where he built conveyors

30

and duct work, and repaired machinery. (*Id.* at 20.) Plaintiff's immediate supervisor was Ken Hebert.

Plaintiff submitted to an asbestosis evaluation at the United Auto Workers union hall on an undisclosed date, sometime prior to June 6, 1995. Those diagnostic procedures revealed symptoms "consistent with a clinical diagnosis of asbestosis...." (Plaintiff's exhibit 15.) A written report to that effect, bearing the date of June 6, 1995, was delivered to plaintiff. The first G.M. official to acquire knowledge of plaintiff's evaluation was the plant's physician, Dr. R.M. Lowery. Dr. Lowery learned of the diagnosis from plaintiff. Shortly after receiving his copy of the evaluation report, plaintiff asked Dr. Lowery to explain the medical terminology to him. (Plaintiff's deposition at 89-90.) Plaintiff's supervisor, Ken Hebert, also acquired knowledge of the evaluation from plaintiff. On August 30, 1995, Hebert informed plaintiff of his intention to transfer him to a maintenance supervisor position in the main plant. (Hebert deposition at 23.) Plaintiff resisted the transfer by telling Hebert he had been diagnosed with asbestosis, and a transfer to the main plant would be detrimental to his condition. (*Id.* at 30.) According to plaintiff, the oil mist and smoke in the main plant would exacerbate the symptoms of his asbestosis. (Plaintiff's deposition at 96, 99.) Plaintiff sought the assistance of Dr. Lowery in opposing the transfer, but Lowery declined: allegedly saying that

2

no remedial measures could be taken unless and until Dyar experienced health problems in the main plant. (*Id.* at 93.)

At a second meeting between plaintiff and Ken Hebert on September 6, 1995, Hebert confirmed his decision to transfer Dyar to the main plant. (Hebert deposition at 45-46, 49-50; plaintiff's deposition at 96.) In response, Dyar requested medical leave, pending clarification of his medical restrictions. (Hebert deposition at 49-50; plaintiff's deposition at 96.)

B.  **Termination of Plaintiff's Employment**

Roger Dyar was suspended from employment on the same day he requested medical leave (September 6, 1995). G.M. based that suspension on plaintiff's alleged violations of the rules and guidelines of G.M.'s "Company Owned Vehicle Purchase Program." Under that program, employees are given discounts on automobiles previously used by the company. Discounts are determined, in part, by the number of miles displayed on a vehicle's odometer. According to G.M., plaintiff was suspended, and eventually terminated, for misrepresenting the mileage on a 1995 Chevrolet Corvette he desired to purchase.

Plaintiff allegedly made the mileage misrepresentations on August 28, 1995. When plant manager Jim Spencer was informed of the alleged misrepresentations, he directed plant personnel director Larry Blaesing to conduct an investigation. (Blaesing deposition at 44.) Blaesing and associate administrator of personnel Billy Stephenson interviewed plaintiff on August 30, 1995

3

(the same day plaintiff told Ken Hebert he had been diagnosed with asbestosis). All other relevant witnesses were interviewed between August 28, 1995 and September 6, 1995.

Upon completion of his investigation, Larry Blaesing forwarded his findings to Frederic P. vandenBerg, director of the salaried personnel department for Delphi Saginaw Steering Systems in Saginaw, Michigan. (Blaesing deposition at 93.) Mr. vandenBerg directed Blaesing to suspend Dyar's employment, and Dyar was informed of that decision on September 6, 1995. Thereafter, vandenBerg consulted Jerry Solgat (Saginaw's senior administrator of personnel services) and Jeff Kipman (Saginaw's divisional personnel director) and concluded that plaintiff's employment should be terminated. (vandenBerg affidavit ¶ 4.) Blaesing informed Roger Dyar of the termination decision on September 8, 1995. (Blaesing deposition at 93.)

Mr. Dyar filed a charge of discrimination with the EEOC on November 21, 1995, and received a notice of right to sue on July 23, 1996. This action was commenced on August 15, 1996.

## II. DISCUSSION

Congress enacted the Americans with Disabilities Act of 1990 (ADA) for the stated purpose of providing "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Congress sought "to assure equality of opportunity, full participation, independent living, and economic self-

4

sufficiency." 42 U.S.C. § 12101(a)(8). To achieve those purposes, the Act commands that

> no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). The Act imposes an affirmative duty on employers to provide reasonable accommodations for disabled individuals. Thus, the term, "discrimination" is defined broadly, to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability ... unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

Thus, Mr. Dyar bears the burden of proving by a preponderance of the evidence that defendant intentionally discriminated against him because of his disability. That can be done either by direct or circumstantial evidence. When, as here, the evidence of intent is circumstantial in nature, the Supreme Court has prescribed an analytical process to evaluate the strength of plaintiff's proof. In three decisions rendered over two decades, the Supreme Court "developed a formula for shifting evidentiary burdens between plaintiff and defendant which permits the establishment of intentional discrimination without direct evidence of unlawful motivation." A.C. Modjeska, *Employment Discrimination Law* § 1:09,

at 39-40 (3d ed. 1996). The order and allocation of burdens of proof, persuasion, and production were first defined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 1093-94, 67 L.Ed.2d 207 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The analytical structure developed by that trilogy has three steps, the ultimate goal of which is that of "progressively ... sharpen[ing] the inquiry into the elusive factual question of intentional discrimination." *St. Mary's Honor Center*, 509 U.S. at 506, 113 S.Ct. at 2746 (quoting *Burdine*, 450 U.S. at 255 n.8, 101 S.Ct. at 1094 n.8).[1]

The first step is satisfied when the plaintiff establishes a *prima facie* case. To establish a *prima facie* case of discrimination under the ADA, a plaintiff must demonstrate: (1) that he has a disability; (2) that he is a "qualified individual" (*i.e.*, that he can perform the essential functions of the job position he holds or seeks, with or without reasonable

---

[1] Although the Eleventh Circuit has not explicitly held to the following effect, it nevertheless is widely agreed that the burden-shifting analysis expressed in *McDonnell Douglas* and its progeny, and applied in Title VII disparate treatment cases, is similarly followed in deciding cases brought under the ADA. *See* McNemar v. The Disney Store, Inc., 91 F.3d 610, 619 (3d Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 958 (1997); Rizzo v. Children's World Learning Centers, Inc., 84 F.3d 758, 761 n.2 (5th Cir. 1996), *cert. denied*, U.S. __, 117 S.Ct. 958 (1997); *see also* Moses v. American Nonwovens, Inc., 97 F.3d 446, 447 (11th Cir. 1996), *cert. denied*, __ U.S. __, 117 S.Ct. 964 (1997)(implicitly using burden-shifting framework); Johnson v. Boardman Petroleum, Inc. 923 F. Supp. 1563 (S.D. Ga. 1996); Lewis v. Zilog, Inc., 908 F. Supp. 931 (N.D. Ga. 1995).

6

accommodation being made by the employer[2]); and, (3) that he was discriminated against because of his disability. *See* 42 U.S.C. § 12132; *Pritchard v. Southern Company Services*, 92 F.3d 1130, 1132 (11th Cir. 1996). In addition, a plaintiff must show that the employer had actual or constructive knowledge of his disability.[3] *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 910 (11th Cir. 1996).

At the second stage of analysis, the burden of production shifts to defendant to rebut the presumption of intentional discrimination thus raised by a *prima facie* case, by articulating

---

[2] 42 U.S.C. § 12111(8) (defining "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires"). *See also* 29 C.F.R. § 1630.2(m) ("Qualified individual with a disability means an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position").

[3] Most courts require plaintiff to establish the relevant decisionmaker possessed knowledge of his or her disability. *See, e.g.*, Hedberg v. Indiana Bell Telephone Company, 47 F.3d 928 (7th Cir. 1995). Therefore, defendant argues on the basis of such authority that the requisite knowledge cannot be attributed to G.M., because its decisionmaker, Frederic P. vandenBerg, had no knowledge of plaintiff's alleged disability. (*See* vandenBerg affidavit ¶ 5.) This court finds that argument persuasive, and is inclined to hold that plaintiff is not entitled to recover for failure to prove that his employer's relevant decisionmaker had knowledge of his alleged disability. In the opinion of this court, that should be the rule in cases such as this, where the relevant decisionmaker was located in another state (Michigan), and there is no evidence that <u>he</u> had <u>any</u> knowledge of plaintiff's alleged disability.
  The Eleventh Circuit, however, has enunciated a broad "constructive knowledge" standard, but has not elaborated the circumstances in which constructive knowledge should be attributed to an employer. *See* Morisky v. Broward County, 80 F.3d 445 (11th Cir. 1996). This therefore is a slippery slope, and this court is not presently prepared to give the parties a sure-footed pronouncement on the issue.
  Moreover, at least three officials (Ken Hebert, Dr. R.M. Lowery, and Billy Stephenson) acquired knowledge of plaintiff's asbestosis prior to the date of his suspension. (Hebert deposition at 29; Plaintiff's deposition at 90; Stephenson deposition at 73.) Billy Stephenson participated in the investigation upon which vandenBerg relied to terminate Dyar's employment, and his knowledge arguably could be attributed to vandenBerg.

7

legitimate, nondiscriminatory reasons for the contested employment action. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

If defendant does so, then in the final step of the inquiry plaintiff must show by a preponderance of the evidence that defendant's stated reasons are mere pretexts for unlawful, discriminatory motives. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

### A. The Prima Facie Case - Is Plaintiff "Disabled"?

The first element plaintiff must establish as part of his *prima facie* case is that he has a "disability." The ADA defines the concept of "disability" in a manner that includes any individual:

> (A) who has a *physical or mental impairment* that *substantially limits* one or more of the *major life activities* of such individual, or
>
> (B) who has a *record of* such an impairment, or
>
> (C) who is *regarded as having* such an impairment.

See 42 U.S.C. § 12102(2). When applying that definition, three questions must be asked: (1) *is the condition an "impairment"?*; (2) *does the impairment "substantially limit" a major life activity?;* and (3) *what qualifies as a "major life activity"?*

#### 1. Is plaintiff's condition an "impairment"?

The ADA does not define those conditions constituting a "physical or mental impairment." Instead, that phrase, and many other significant terms in the Act, are only defined in regulations

8

promulgated by the Equal Employment Opportunity Commission[4] pursuant to authority delegated by Congress,[5] and, in the "Interpretive Guidance on Title I of the Americans With Disabilities Act" attached as an appendix to those regulations. Those regulations are not binding on this court. Nevertheless, "courts may rely upon the regulations promulgated by the Equal Employment Opportunity Commission ... for guidance" when interpreting the ADA. *Gordon v. E.L. Hamm & Associates, Inc.*, 100 F.3d 907, 911 (11th Cir. 1996). Moreover, the Supreme Court has long recognized that an agency's interpretation of a statute it is charged with enforcing should be given "considerable weight," and should not be disturbed unless it appears from the statute or legislative history that Congress intended a different construction.

> [When] Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 433, 434, 91 S.Ct. 849, 854-55, 28 L.Ed.2d 158 (1971)(administrative interpretations "entitled to great deference"). The *Chevron* standard is applied by

---

[4] *See* 29 C.F.R. § 1630.

[5] *See* 42 U.S.C. § 12116 (requiring the EEOC to issue regulations to implement Title I of the ADA).

9

the Eleventh Circuit in the context of ADA claims. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 521 (11th Cir. 1996).

The EEOC's administrative interpretations of the ADA define a "physical impairment" as including:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, <u>respiratory</u> (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or ....

29 C.F.R. § 1630.2(h)(1)(emphasis supplied). Applying that definition to the facts, there can be little doubt that plaintiff suffers from a physical impairment of the respiratory system: asbestosis is

> a form of lung disease (pneumoconiosis) caused by inhaling fibers of asbestos and marked by interstitial fibrosis of the lung varying in extent from minor involvement of the basal areas to extensive scarring; it is associated with pleural mesothelioma and bronchogenic carcinoma.

Dorland's Illustrated Medical Dictionary 146 (W.B. Saunders et al. eds., 28th ed. 1994). Indeed, defendant does not directly contest this issue.

"A physical impairment, standing alone, however, is not necessarily a disability as contemplated by the ADA. ... The ADA requires that the impairment <u>substantially limit</u> one or more of the individual's <u>major life activities</u>." *Gordon*, 100 F.3d at 911 (citations omitted)(emphasis supplied).[6]

---

[6] *See also* I B. Lindemann & P. Grossman, *Employment Discrimination Law* 276 (3d ed. 1996):
  The definitions of "major life activity" and "substantial

10

### 2. Does plaintiff's impairment "substantially limit" a "major life activity"?

Plaintiff broadly alleges that he is "limited in major life activities such as breathing, walking, engaging in activities, performing manual tasks and working." (Plaintiff's brief at 23.)

The EEOC includes "breathing," "walking," and "working" among its lists of those functions constituting "major life activities." For example, 29 C.F.R. § 1630.2(i) provides that:

> (i) *Major Life Activities* means functions such as caring for oneself, performing manual tasks, <u>walking</u>, seeing, hearing, speaking, <u>breathing</u>, learning, and <u>working</u>. [Emphasis supplied.]

Further, the Interpretative Guidance attached as an Appendix to that section elaborates as follows:

> Section 1630.2(i)  Major Life Activities
> This term adopts the definition of the term "major life activities" found in the regulations implementing section 504 of the Rehabilitation Act at 34 CFR part 104. "Major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty. Major life activities include caring for oneself, <u>performing manual tasks,</u> walking, seeing, hearing, speaking, <u>breathing,</u> learning, and <u>working.</u> <u>This list is not exhaustive</u>. For example, other major life activities include, but are not limited to, sitting, standing, lifting, reaching. ...

---

limitation" are closely allied. "Major life activities" are the basic activities that average persons can perform with little or no difficulty, "such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." "Substantially limits" means either the total inability or a severe restriction on the ability to perform a major life activity (in terms of condition, manner, or duration) as compared to the general population. The determination of whether an individual is "disabled" [therefore] depends on the effect the impairment has on the particular individual's life, and not simply on the name or diagnosis of the impairment. [*Quoting* 29 C.F.R. §§ 1630.2(i), 1630.2(j)(1).]

11

29 C.F.R. Pt. 1630, App. § 1630.2(i), at 402 (citations omitted)(emphasis supplied).

The more difficult question is whether plaintiff's impairment <u>substantially limits</u> the major life activities of breathing, walking, performing manual tasks, or working. That phrase, "substantially limits," also is not defined by the ADA, but implementing regulations instruct that it means the plaintiff either is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1). The EEOC further instructs that the following factors should be considered in determining whether a particular individual is substantially limited in a major life activity:

> (i) The nature and severity of the impairment;
>
> (ii) The duration or expected duration of the impairment; and
>
> (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2).

12

To support his broad claims of disability, Roger Dyar offers an unauthenticated "asbestosis evaluation summary,"[7] reading in pertinent part as follows:

> **DIAGNOSIS/IMPRESSION**: The appearance of the chest x-ray and the restrictive abnormalities on pulmonary function testing are consistent with a clinical diagnosis of asbestosis in a subject with a history of intense industrial exposure to asbestos-containing materials and an adequate latent period.
>
> **PROGNOSIS**: In my professional opinion, the patient is at increased risk for development of bronchogenic carcinoma, mesothelioma, and other cancers, as well as further deterioration in pulmonary function, even in the absence of additional asbestos exposure. Due to the latency period between exposure to asbestos and the onset of clinically significant asbestos-related disease, we anticipate that this patient's condition may progress, and that he may develop other asbestos-related diseases in the future, including bronchogenic carcinoma and other malignancies.
>
> This report relates only to the diagnosis of asbestos-related diseases, and is not intended to serve as a comprehensive evaluation of all health problems. It is recommended that the client undergo at least annual pulmonary re-evaluation as well as close clinical follow-up by his regular physician. In addition, he should continue to avoid tobacco consumption.

(Plaintiff's exhibit 15 (footnotes omitted).) That report merely confirms that plaintiff suffers from an "impairment," but imposes no limitations upon his activities other than recommending he "continue to avoid tobacco consumption." Indeed, plaintiff admits only two restrictions have been imposed by any physician: avoid smoking cigarettes; avoid inhaling ammonia. (Plaintiff's deposition at 145.) Even so, plaintiff may testify as to his own

---

[7]Even though plaintiff made no effort to authenticate this document, G.M. has not moved to strike it from the record. Consequently, this court will consider it when deciding defendant's motion for summary judgment.

13

bodily condition, and he described the following limitations on his activities:

> Your lungs won't hold enough air. It contains them, and then they're not big enough for your body. And when you exert a certain amount of energy, you don't take enough air down.
>
> ...
>
> Well, sure, I can't work like I used to because I cannot breathe.
>
> ...
>
> Well, I certainly can't run around this block.
>
> ...
>
> Well, I mean, there is a lot of things I can't do. Anything that exerts you, like jacking vehicles up, all that kind of junk. I don't do any of that.
>
> ...
>
> Don't roller skate anymore.

(Plaintiff's deposition at 146-47.) Such testimony is not sufficient to establish that plaintiff is "substantially limited" in the performance of any "major life activity," however, because it does not distinguish plaintiff in any manner from "the average person in the general population." 29 C.F.R. § 1630.2(j)(1). It also does not provide insight into "the nature and severity of the impairment," "the duration or expected duration of the impairment," or the "long term impact" of the impairment. 29 C.F.R. § 1630.2(j)(2). Further, the foregoing testimony should be contrasted with plaintiff's subsequent admission that he <u>can</u> perform some strenuous activities, such as mowing his lawn and

14

changing the tires on his car (Plaintiff's deposition at 148), and his assertion that "there is sure not anything out at Saginaw that I couldn't do." (*Id.* at 147.) Finally, and significantly, plaintiff takes no medication and has visited a doctor only once during the past two years. (*Id.* at 8, 146.)

In *Robinson v. Global Marine Drilling Company*, 101 F.3d 35 (5th Cir. 1996), the plaintiff suffered from asbestosis, possessed a lung capacity which was 50% of normal, and experienced shortness of breath while climbing ladders. The plaintiff's personnel file also "contained a reference to his pulmonary problems." *Id.* at 36. The *Robinson* plaintiff offered no expert medical testimony and presented only his own testimony to establish a disability. *Id.* at 37. The Fifth Circuit held that "[s]everal instances of shortness of breath when climbing stairs do not rise to the level of substantially limiting the major life activity of breathing." *Id.*

This court agrees and finds that Roger Dyar's testimony of shortness of breath while running, repairing automobiles, and rollerskating does not establish a substantial limitation on the major life activity of breathing. This court further finds that Dyar has not demonstrated a substantial limitation on any other major life activity. Consequently, he has not met his burden of demonstrating he "has a physical or mental impairment that substantially limits one or more of the major life activities of the individual." 42 U.S.C. § 12102(2)(A).

15

### 3. Does plaintiff have a record of a disability?

Plaintiff also may be considered "disabled" if he "has a record" of an impairment which substantially limits a major life activity. 42 U.S.C. § 12102(2)(B). Plaintiff makes the bald assertion that "G.M. had a record of his disability prior to his termination," but refers to no evidence in support of that argument. (Brief in opposition to summary judgment at 23)

Presumably, plaintiff refers to two medical records which allegedly were in G.M.'s possession. This court already has discussed the relevant portions of the "asbestosis evaluation summary" which was shown to Dr. Lowery. (*See* part II, A, 2 *supra* at 12-13.) In addition to that report, Dr. Lowery allegedly registered Roger Dyar's condition in his company medical records:

> Medical notes made by Dr. R. Michael Lowery into the file of Charging Party indicate: "Has asbestoses [sic] with mild restrictions on PFT's." This statement was recorded on 09/01/95.

(Plaintiff's exhibit 13.)

The "asbestosis evaluation summary" and G.M. medical records do not demonstrate a "record" of a <u>substantially limiting</u> impairment, however. That is pertinent because EEOC regulations provide:

> (k) *Has a record of such impairment* means has a history of, or has been misclassified as having, a mental or physical impairment that <u>substantially limits</u> one or more major life activities.

16

29 C.F.R. § 1630.2(k)(emphasis supplied). Furthermore, the interpretive guidance demonstrates that an employer must possess some record of a substantially limiting impairment.

> This part of the definition is satisfied if a record relied upon by an employer indicates that the individual has or has had a substantially limiting impairment. The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities. There are many types of records that could potentially contain this information, including, but not limited to, education, medical, or employment records.

29 C.F.R. Pt. 1630, App. § 1630.2(k), at 404 (emphasis supplied).

Neither of the records relied upon by plaintiff demonstrate a "substantially limiting impairment." They are silent on "the nature and severity of the impairment," "the duration or expected duration of the impairment," and the "long term impact" of the impairment. 29 C.F.R. § 1630.2(j)(2). Moreover, they provide no distinction between plaintiff and "the average person in the general population." 29 C.F.R. § 1630.2(j)(1). Consequently, this court finds plaintiff has not fulfilled his burden of demonstrating a "record of" a disability.

### 4. Was plaintiff "regarded as" disabled?

Finally, if an individual cannot satisfy either the first part of the ADA's definition of "disability," or the second, "record of" portion, he still may be able to satisfy the third prong of the definition, providing that a person who is "regarded" by an employer "as having such an impairment" — *i.e.*, one that substantially limits a major life activity — is an individual with

17

a disability. 42 U.S.C. § 12102(2)(C). The EEOC Interpretive Guidance lists three different ways in which an individual may satisfy the definition of "being regarded as having a disability":

> (1) The individual may have an impairment which is not substantially limiting but is perceived by the employer or other covered entity as constituting a substantially limiting impairment;
>
> (2) The individual may have an impairment which is only substantially limiting because of the attitudes of others toward the impairment; or
>
> (3) The individual may have no impairment at all but is regarded by the employer or other covered entity as having a substantially limiting impairment.

29 C.F.R. Pt. 1630, App. § 1630.2(1), at 404.

Plaintiff makes no argument and presents no evidence demonstrating that G.M. "regarded" him as disabled, and this court's review of the record disclosed no such evidence.

Accordingly, this court concludes that Roger Dyar has not demonstrated that he suffers from a "disability." He therefore has not demonstrated a *prima facie* case, and summary judgment is appropriate.

**B. Reasonable Accommodation**

Dyar's complaint generally states that he "was denied reasonable accommodations" because of his alleged disability. (Complaint ¶ 12.) That claim is disposed of by this court's finding that Dyar failed to demonstrate a disability. Even without such a finding, however, summary judgment still would be appropriate because Dyar does not respond to G.M.'s arguments on reasonable accommodation. *See Brewer v. Purvis*, 816 F. Supp. 1560, 1579 (M.D.

18

Ga. 1993), *aff'd*, 44 F.3d 1008 (11th Cir. 1995)("Summary judgment is appropriate since Plaintiff failed to respond to [defendant's] argument on this issue"); *see also Wiley v. Earl's Pawn & Jewelry, Inc.*, 950 F. Supp. 1108, 1113 n.4 (S.D. Ala. 1997); *Southern Nevada Shell Dealers Association v. Shell Oil*, 725 F. Supp. 1104, 1109 (D. Nev. 1989).

### III. CONCLUSION

For the foregoing reasons, this court concludes that General Motors Corporation is entitled to summary judgment on all claims. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this the 16th day of January, 1998.

_____
United States District Judge



19